IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| IN THE MATTER OF THE USE OF A CELL-SITE SIMULATOR TO IDENTIFY THE CELLULAR DEVICES CARRIED BY MICHAEL MISKE, JR. | Case No. 16-0693 KJM<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, AUSTIN KYLE JACKSON, being first duly sworn, hereby depose and state as

follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under Federal

Rule of Criminal Procedure 41 to authorize law enforcement to employ an electronic investigative

technique further described in Attachment B, in order to identify the cellular device or devices carried

by Michael Miske, Jr. (the "Target Cellular Device"), described in Attachment A.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been

since January 11, 2015.  I am presently assigned to the Criminal Enterprise Squad of the FBI's

Honolulu Field Office where my duties include investigating Organized Crime, Money Laundering,

Extortion and other major federal violations.  I have participated in investigations which utilized

email records to effectively identify subjects and gather evidence.  In addition, I have participated in

investigations which utilized Title III investigations and telephone records to effective identify

subjects and gather evidence.  I have also drafted search warrants that have led to valuable evidence

collection.  During my instruction at the FBI Academy, Quantico, Virginia, I received training in a

variety of investigative and legal matters, including the topics of Fourth Amendment searches, the

drafting of search warrant affidavits, and probable cause.  Prior to my assignment with the FBI, I was

a police officer with the Fairfax County Police Department, Virginia in excess of five years where I

investigated a number of state violations. Specifically, I participated in a number of short-term drug

investigations, subsequently leading to arrests and convictions on behalf of the Commonwealth of

Virginia. In addition, I was involved in the execution of numerous search warrants in relation to

various criminal offenses. As a federal agent, your affiant is authorized to investigate violations of

laws of the United States and is a law enforcement officer with the authority to execute search

warrants issued under the authority of the United States.

      3.     The facts in this affidavit come from my personal observations, my training and

experience, and information obtained from other agents and witnesses. This affidavit is intended to

show merely that there is sufficient probable cause for the requested warrant and does not set forth all

of my knowledge about this matter.

      4.     This Court has authority to issue the requested warrant under Federal Rule of Criminal

Procedure Rule 41(b)(1) and (2) because the Target Cellular Device is currently believed to be

located inside this district because the Target Cellular Device's owner, Michael MISKE, Jr.

(hereinafter referred to as MISKE), resides at 1226 Kuuna Street, Kailua, Hawaii 96734. This is a

residence located within the District of Hawaii. In addition, MISKE owns several businesses located

in the District of Hawaii. MISKE has been observed by the FBI in the District of Hawaii as recently

as April 2016. Pursuant to Rule 41(b)(2), law enforcement may use the technique described in

Attachment B outside the district provided the device is within the district when the warrant is issued.

      5.     Based on the facts set forth in this affidavit, there is probable cause to believe MISKE

and others known and unknown, constituted an enterprise, that is, a group of individuals and entities

associated as described in 18 U.S.C. § 1961(4); and that members and associates of this enterprise,

including the subjects, committed, are committing, or will be committing the offenses of RICO and

RICO Conspiracy, in violation of 18 U.S.C. § 1961 and 18 U.S.C. § 1962(d) by conducting and conspiring to conduct the affairs of the enterprise, which enterprise engaged in, and the activities of which affected, interstate commerce, through a pattern of racketeering activity consisting of dealing in a controlled substance, extortion, gambling, acts chargeable under Hawaii State law and activity indictable under 18 U.S.C. § 1951 (Interference of Commerce by Threats or Violence) and 18 U.S.C. § 1084 (Transmission of Wagering Information).  There is also probable cause to believe that the identity of the Target Cellular Device will constitute evidence of those criminal violations.  In addition, in order to obtain additional evidence relating to the Target Cellular Device, its user, and the criminal violations under investigation, law enforcement must first identify the Target Cellular Device.  There is probable cause to believe that the use of the investigative technique described by the warrant will result in officers learning that identifying information.

6.     Because collecting the information authorized by this warrant may fall within the statutory definitions of a "pen register" or a "trap and trace device," *see* 18 U.S.C. § 3127(3) and (4), this warrant is designed to comply with the Pen Register Statute as well as Rule 41. *See* 18 U.S.C. §§ 3121-3127.  This warrant therefore includes all the information required to be included in a pen register order. *See* 18 U.S.C. § 3123(b)(1).

## BACKGROUND ON MICHAEL MISKE

7.     For more than ten years, FBI Honolulu has received information from various Cooperating Witnesses (CWs), Confidential Informants (CIs) and law enforcement partners that Michael MISKE was involved in drug trafficking, gambling, extortion and that MISKE utilized multiple Hawaii businesses to launder money.  Based on the information provided, FBI Honolulu opened an investigation into the alleged criminal activity of Michael MISKE.  By way of background, Michael MISKE, his arrest record and his numerous businesses are identified below:

**Name:**          Michael John Miske, Jr.

**Date of Birth:**     15 February 1974

**Arrest Record:**                                              **Status:**

| | |
|---|---|
| 6/9/2013 – Excess Speeding | Guilty |
| 5/24/2013 – Assault 2, Criminal Property Damage 2 | Pending |
| 1/30/2013 – Assault 2 | Dismissed |
| 9/27/2007 – Harassment | Dismissed |
| 11/7/2005 – Assault 3 | Guilty |
| 6/25/2000 – Violate Protection Order | Not Guilty |
| 6/23/1995 – Assault 1, Speeding, Kidnapping | Guilty |
| 4/28/1995 – Fraudulent Use of Credit Card, Theft 3; Theft 2 | Guilty |
| 2/1/1994 – Theft 2 | Guilty |
| 8/11/1993 – DWOL | Guilty |

**MISKE's Active Businesses:**

1. Palekaiko Beachboys Club, Inc.
2. Kama'aina Termite and Pest Control, Inc.
3. Kama'aina Plumbing Company LLC
4. Certified Termite & Pest Management LLC
5. Certified Pest Management, Inc.
6. Hawaii Partners LLC
7. Kama'aina Solar Solutions LLC
8. Kamaaina Capital LLC

**MISKE's Inactive Businesses:**

1. The Tint Shop Incorporated
2. Pestco Group Inc.
3. The Tint Shop and Safety Films LLC
4. Kama'aina Termite, Kona LLC
5. Kama'aina Rolloffs LLC
6. Leverage Entertainment LLC
7. North Shore Juice LLC

4

## SOURCES OF INFORMATION

**Confidential Informants (CIs)**

8.      CI#2 was a Honolulu-based bookie prior to being charged with Transmission of
Wagering Information in violation of 18 U.S.C. § 1084 and Failure to File Tax Return in violation of
26 U.S.C. § 7203.  CI#2 agreed to cooperate with the ongoing investigation and voluntarily became a
confidential informant.  CI#2 was well-connected within Hawaii criminal organizations, and he has
provided valuable information that was frequently corroborated through investigation and
information provided by other sources.  CI#2 provided details pertaining to MISKE's commercial
fishing vessels and drug trafficking.  CI#2 was sentenced to probation for the above referenced
violations; due to CI#2's probation status, CI#2 is no longer a CI.

9.      CI#3 grew up in Hawaii, and he socialized with friends and associates of MISKE.  CI#3
agreed to cooperate with ongoing investigations and voluntarily became a confidential informant in
2012.  CI#3 has provided valuable information that was frequently corroborated through investigation
and information provided by other sources.  CI#3 provided details pertaining to MISKE's businesses
and associates.

10.     CI#5 was a Honolulu businessman who ran a large pest-control business.  CI#5 agreed
to cooperate with the ongoing investigation and voluntarily became a confidential informant for the
FBI in 2015.  CI#5 does not have a criminal record, and he has not been paid for information.  CI#5
provided details pertaining to MISKE's businesses.

11.     CI#6 was the operations manager for MISKE for approximately 10 years.  CI#6 agreed
to cooperate with the ongoing investigation and voluntarily became a confidential informant for the
FBI in 2015.  CI#6 does not have a criminal record, and he has not been paid for information.  CI#6
provided details pertaining to MISKE's businesses and associates.

12.   Your affiant requests to keep the referenced CIs' names' confidential due to their cooperation in this ongoing investigation.  Your affiant believes the disclosure of the CIs' names' would jeopardize the investigation and potentially the CIs' safety.

**Cooperating Witnesses (CW's)**

13.   CW#1 was briefly employed by MISKE in 2014.  CW#1 had direct contact with MISKE and observed the day-to-day operations at MISKE's businesses.  CW#1 agreed to cooperate with the ongoing investigation and voluntarily provided information to the FBI.  CW#1 was not paid for information, and he provided details pertaining to MISKE's businesses.

14.   CW#2 lived in Honolulu, Hawaii, and he was a client of MISKE's business in 2015.  CW#2 agreed to cooperate with the ongoing investigation and voluntarily provided information to the FBI.  CW#2 was not paid for information, and he provided details pertaining to MISKE's businesses.

15.   CW#5 was a self-employed event promoter in Honolulu, Hawaii.  CW#5 was assaulted by MISKE and MISKE's employees in the area of MISKE's night club.  CW#5 agreed to cooperate with the ongoing investigation and voluntarily provided information to the FBI.  CW#5 was not paid for information, and he provided details pertaining to MISKE and MISKE's associates.

16.   CW#6 was an event coordinator at a Honolulu County, Hawaii high school.  CW#6 was a witness to CW#5's assault, during which CW#6 was also assaulted.  CW#6 agreed to cooperate with the ongoing investigation and voluntarily provided information to the FBI.  CW#6 was not paid for information, and provided details pertaining to MISKE and MISKE's associates.

17.   CW#7 was an automobile dealer in Honolulu, Hawaii.  CW#7 was assaulted by MISKE and MISKE's associates after completing a financial transaction with MISKE for an automobile originally purchased at auction.  CW#7 agreed to cooperate with the ongoing investigation and

voluntarily provided information to the FBI. CW#7 was not paid for information, and provided details pertaining to MISKE and MISKE's associates.

18.    CW#8 was a sales associate for a large pest-control business. CW#8 was assaulted by MISKE's associates at the direction of MISKE. CW#8 agreed to cooperate with the ongoing investigation and voluntarily provided information to the FBI. CW#8 was not paid for information, and provided details pertaining to MISKE and MISKE's associates.

19.    CW#9 was a source of information deemed reliable for reports previously provided to Special Agents (SAs) and Task Force Officers (TFOs). CW#9voluntarily provided information to SAs and TFOs. CW#9 was not paid for information, and provided details pertaining to MISKE and MISKE's associates.

20.    CW#10 was a source of information deemed reliable for reports previously provided to SAs and TFOs. CW#10 voluntarily provided information to SAs and TFOs. CW#10 was not paid for information, and provided details pertaining to MISKE and MISKE's associates.

21.    CW#11 was a regional manager for a large pest-control business. CW#11 provided information about an assault coordinated by MISKE's associates and other threats committed by MISKE. CW#11 agreed to cooperate with the ongoing investigation and voluntarily provided information to the FBI. CW#11 was not paid for information, and provided details pertaining to MISKE and MISKE's associates.

22.    Your affiant requests to keep the referenced CWs' names' confidential due to their cooperation in this ongoing investigation. Your affiant believes the disclosure of the CWs' names' would jeopardize the investigation and potentially the CWs' safety.

## **PROBABLE CAUSE**

**Miske's Businesses**

23.    On October 10, 2014, CW#1 reported that MISKE owned the following businesses:

   a.   Kama'aina Termite and Pest Control (KTPC)

   b.   Kama'aina Plumbing (KP)

   c.   Kama'aina Solar (KS)

   d.   M Nightclub

   e.   Rowbar

   f.   Commercial fishing operations

According to CW#1, KTPC was MISKE's primary business; KTPC had approximately three trucks used to provide fumigation services to residential and commercial customers. MISKE complained that fumigations were not very profitable. KP was operated by a relative of MISKE; the company only had a few employees, and they did not handle many projects. KS was also a small, unprofitable business. M Nightclub was in an expensive location, yet the crowds were small, and CW#1 estimated the bar was not able to generate significant profit. MISKE owned a commercial fishing operation utilizing FV Rachel. While MISKE likely spent about $1,000,000 on Rachel, MISKE had no personal interest or experience in the fishing industry. MISKE appeared to have a significant amount of money. MISKE owned various properties, and he was building a large ocean-front house in Portlock, Hawaii. MISKE had multiple luxury vehicles stored in his warehouses, and he was able to lease expensive business locations. CW#1 had previously been a bar-owner and commercial fisherman. Based on CW#1's business experience, CW#1 determined MISKE must have an illegitimate means of income to support his expensive lifestyle. CW#1 reported that KTPC and MISKE's other business could not generate as much money as MISKE spends.

8

24. On March 19, 2015, CI#5 reported that MISKE owned KTPC. KTPC was primarily a termite fumigation business. Due to the poison gas (Vikane) that was used for fumigations, MISKE was required to comply with a number of regulations pertaining to the use and transportation of Vikane. MISKE appeared to violate numerous regulations, and CI#5 did not know how MISKE was able to pass State inspections. Based on CI#5's experience, it would be unlikely that a fumigation business could generate more than 10 percent profit annually. CI#5 estimated KTPC's annual gross sales to be approximately $2.5 million allowing a maximum of $250,000 profit. In addition to standard operating expenses, MISKE paid his employees significantly higher wages than his competitors, he purchased expensive company vehicles and he paid for costly and frequent advertisement. Yet, MISKE drove exotic cars, purchased expensive real estate and maintained an overall "flashy lifestyle." Based on the size of KTPC and the manner in which MISKE operated the business, CI#5 reported MISKE's apparent profit was "impossible." Thus, CI#5 stated that MISKE must have a source of significant income other than KTPC.

## Miske's Dealing in Controlled Substances

25. On February 19, 2016, CW#9 reported that Michael BUNTENBAH was a source of drug supply for ███████████ ██████████ was an associate of ████████ who had knowledge of the location where ████████ hid his drug supply.

26. On March 2, 2016, your affiant analyzed search warrant results from a search warrant served on Apple, Inc. on January 15, 2016 for records pertaining to MISKE. A photograph, or "screen shot," of a text message conversation taken by MISKE was discovered. The participants of the conversation were MISKE and an individual named ████████████████████████. The two discussed the whereabouts of ████████████████████ and ████████████ ████████████ ██████████ and ████████ were known drug dealers in the Honolulu, Hawaii area.

9

The discussion also suggested that ███████ and ███████ were potentially "busting concrete," a term your affiant understands through training and experience to refer to processing cocaine in anticipation for resale.  Further analysis revealed a telephone contact list for MISKE containing the telephone number ████████████████████████████  The subscriber name for ████ ██████████████████████████████████████ through open source.  Telephone analysis of (808) 498-7335 revealed contact with telephone numbers associated with MISKE and Michael BUNTENBAH from January to June 2015.

### Miske's Interference of Commerce by Threats of Violence

27.     On May 19, 2015, CW#2 reported that he recently hired KTPC to fumigate his van using a specific method that KTPC agreed upon.  CW#2 notified KTPC that he considering speaking to the Environmental Protection Agency (EPA) following the fumigation services due to a discrepancy with what method and chemicals were used.  MISKE, the owner of KTPC, contacted CW#2 by phone and stated, "Listen white boy, you're not fucking from Hawaii.  I'll take care of you and your van right now."  MISKE continued by threatening he would "beat the shit out of [CW#2] right now."  MISKE called CW#2 a second time and asked, "Do you want to disappear in Hawaii? It's not like the mainland; things happen here."

28.     On October 8, 2015, CI#6 reported that MISKE previously assaulted a Terminix salesman for providing potential clients with bad reviews of KTPC.  CI#6 recalled that Elton SANTOS (KTPC salesman) informed MISKE about the salesman's sales tactic at a staff meeting one morning.  MISKE eventually found out the identity of the Terminix salesman.  CI#6 later heard that MISKE and his "boys" located the salesman and brutally beat him.  The beating was confirmed by CI#6 and other employees of KTPC.  CI#6 learned that MISKE conducted a similar assault against a competing fishing operation.  The competitor was beaten and forced to raise his fish prices.

10

29.     On January 20, 2016, CW#5 reported that he was assaulted by MISKE and his associated after setting up an outdoor advertisement for an upcoming event near MISKE's night club on December 15, 2012.  MISKE learned of the event promotion and placed a phone call to security staff at M Nightclub, specifically the head bouncer, Michael BUNTENBAH.  BUNTENBAH rallied four to five bouncers who responded to MISKE's location.  When CW#5 told MISKE that he was allowed to conduct the promotion in a public area, MISKE stated, "I don't give a fuck, you don't disrespect me and pass out fliers around here."  The group of bouncers, including John STANCIL, began punching and kicking CW#5.  CW#5's friends were also assaulted and $7,000 worth of audio/visual equipment owned by CW#5.  MISKE and his associates deleted video from witnesses' phones and eventually fled the area.  CW#5 was transported to a local hospital and suffered broken ribs.  CW#5 hired an attorney; however, the attorney claimed that he was no longer willing to represent CW#5 despite initially agreeing.  The attorney never provided CW#5 with a reason, but CW#5 assumed it was because the attorney represented one of MISKE's acquaintances.  CW#5's criminal case against MISKE was continued a number of times in court and witnesses to the assault have refused to testify due to fear of retaliation by MISKE and/or MISKE's network.  CW#5 filed a Temporary Restraining Order for protection against MISKE.

30.     On January 26, 2016, CW#6 reported that she was present during the assault of CW#5 on December 15, 2012.  CW#6 was also assaulted during the incident.  While setting up the promotion, MISKE approached in a vehicle and began yelling, "What the fuck are you doing?  This is my club!  You don't do this shit!  How do you think this looks?  I let you come into my club all the time, and you fucking do this shit?"  MISKE also stated, "You guys better not ever fucking do this shit again!"  CW#6 began helping CW#5 pack-up the equipment to avoid further confrontation.  However, four men including John STANCIL, Michael BUNTENBAH, and ▮▮▮▮▮▮▮▮▮,

11

appeared from the area of MISKE's night club. The men began punching and kicking CW#5 even

after CW#5 fell to the ground.  CW#6 attempted to intervene, but was kicked in the face and

shoulder.  John STANCIL kicked CW#6 in the ear.  MISKE and another one of the assailants began

destroying the audio/visual equipment.  MISKE and his associates fled after the police were called by

another bystander.  CW#6 received treatment at a local hospital and gave a statement to officers from

the Honolulu Police Department at that time.  In the days following the assault, CW#6 heard that

MISKE made a phone call to BUNTENBAH on the night of the assault.  BUNTENBAH collected the

group of assailants by asking, "Who's got this one?"  The assailants then exited the night club.

CW#6 continues to have nightmares and lives in fear that MISKE will come to CW#6's residence for

retaliation.

      31.     On February 1, 2016, CW#7 reported that he met MISKE at an automobile auction in

Honolulu, Hawaii and was later assaulted by MISKE and MISKE's associates. CW#7 purchased a

repossessed vehicle at the auction, which he later sold to MISKE after negotiating a price.  MISKE

contacted CW#7 several days later and demanded CW#7 meet with him in a public parking lot.

MISKE arrived at the meeting with two associates, one of whom was identified John STANCIL.

MISKE began yelling obscenities at CW#7 and demanded that CW#7 return the money MISKE paid

for the vehicle.  CW#7 refused, claiming that all sales were final.  MISKE motioned to his two

associates, and STANCIL punched CW#7 in the face.  The assault continued after CW#7 fell to the

ground.  MISKE stopped the assault and implied that if CW#7 did not return the money, the next

encounter would be more violent.  CW#7 was hospitalized and suffered a fractured nose, a fractured

jaw, a broken tooth, and eventually developed two black eyes.  CW#7 filed a police report for the

assault.  CW#7 received a phone call from MISKE after leaving the police station.  MISKE stated

that he would "fuck [CW#7] up," "come to [CW#7's] house, and "get [CW#7]" if CW#7 did not

repay MISKE. CW#7 filed an additional police report and a Temporary Restraining Order against MISKE. CW#7 has been afraid to return to the automobile auction since the assault.

32.     On March 17, 2016, CW#8 reported that he was contacted by an unknown caller on March 22, 2011 to provide an estimate for pest services at a residence available for sale. CW#8 arrived at the residence and was immediately punched in the face by an unidentified male, causing CW#8 to lose consciousness and strike his forehead on the pavement. CW#8 awoke and found that he was bleeding profusely. CW#8 observed his attacker and another man fleeing the scene. CW#8 was transported to a local hospital by ambulance. CW#8 was required to wear a neck brace and suffered nerve damage in addition to contusions, bruises, and cuts. CW#8 required rehabilitation once a week for a six month period. CW#8 was not able to work during that time and had to be cleared by a doctor before returning to work. CW#8 received a threatening phone call following the attack. The caller was the same as the initial caller. The caller explained that the same style of attack would be conducted on CW#8 again if CW#8 did not stop speaking negatively of Kama'aina Termite and Pest Control (KTPC) during CW#8's sales pitches. The caller asked if CW#8 wanted to spend the rest of his life in a wheelchair. During the same time period, one of CW#8's colleagues received similar threatening phone calls allegedly from MISKE or one of MISKE's associates. After seeing the physical injuries CW#8 received, the colleague decided to move to the mainland due to his fear of KTPC. CW#8 also recalled seeing three men arrive in a van outside his house one evening following the assault. The men appeared to be ascertaining whether CW#8 lived at the residence. CW#8 believed they were affiliated with MISKE and that they were there to shoot him. CW#8's family lived in constant fear of retaliation from MISKE and KTPC. CW#8 stated that prior to the referenced assault, he had occasionally provided potential clients with negative customer reviews written about KTPC. Following the assault, CW#8 never once said anything negative about KTPC. Instead, if a

13

client was looking for a cheaper price, CW#8 suggested the client obtain the services of KTPC.

CW#8 feared that he would be killed if he ever said anything negative about KTPC.  In addition, as a

result of the assault on CW#8, management from CW#8's company held a statewide meeting of sales

associates to instruct them to cease using negative sales reviews about KTPC.  Management used

CW#8's injuries as an example of what could happen to the sales representatives if they did not.

33.    On April 4, 2016, CW#11 reported on an assault committed by MISKE's associates on

CW#8 as well as the events that transpired afterward.  CW#11 was notified of CW#8's assault on

March 22, 2011.  CW#11 also learned that another employee had been telephonically threatened by

an unknown individual who told the employee to stop speaking negatively of KTPC during sales

pitches.  CW#11 explained that providing negative information about a competing company to

potential customers was an established business practice and was not solely focused on any one

company.  CW#11 called MISKE to get to the bottom of the threats.  MISKE denied being involved

in the assault, but explained that CW#11's staff should no longer provide negative information about

KTPC in order for the assaults to stop.  CW#11 complied with MISKE's demand.  On March 23,

2011, CW#11 held a meeting with all company sales associates in Hawaii.  CW#11 told the staff to

stop mentioning KTPC during sales or else they could suffer the same consequences as CW#8.

CW#11's statements were a direct result of CW#11's conversation with MISKE, the phone threats,

and the assaults.  The new policy had a lasting impact on the way the company did business in

Hawaii.  CW#11 believed MISKE and KTPC were somehow connected to crime and regarded KTPC

as an abnormal and illegitimate business.

**MISKE's Telephonic Threats toward Honolulu Police Department Officers**

34.    On or about November 13, 2015, Honolulu Police Department (HPD) officers

attempted to initiate a traffic stop on MISKE's vehicle for a traffic violation.  MISKE refused to stop

14

for the officers and fled from the area. MISKE was positively identified by the officers as the driver

of the vehicle. On November 14, 2015, HPD officers attempted to locate MISKE at M Nightclub as a

result of his unwillingness to turn himself in to authorities on charges for refusing to obey a lawful

order to stop. The officers asked security staff if they could speak with MISKE. Security staff replied

that MISKE was inside and that they would retrieve him for the officers. However, security staff

returned without MISKE and explained that he was not present. In addition, one of the security staff

intentionally blocked the entrance and denied entrance to the officers. Officers eventually surmised

that MISKE left the night club through a rear exit. One of the officers present at the night club

received a phone call on his personal cellular telephone from a male a short time later. The male caller

identified himself as MISKE. MISKE made the following remarks: "Don't be going over there

throwing you guys' weight around…I can press charges just as much as you can, bruddah…Listen, I

gon' go to the top of the food chain, trust me, [HPD officer's name]…You going get me for a traffic

warrant? Big deal. I'll pay that all day. I don't care about that…Don't you go to my place of business

and act a fool…I swear I'll have everybody over there put a TRO on you…You better be careful for

the threats you made, [HPD officer's name]…You are making threats over there, and I'm telling you,

don't do that…Come on, this is one traffic violation, bro…I told you, when my attorney comes back, I

turning myself in…Bruddah, don't need to make this one big deal, bruddah."

### MISKE's Transmission of Wagering Information

35.     On November 24, 2014, CI#3 reported that MISKE, the owner of M Nightclub owed

$40,000 in gambling losses to a Honolulu bookie that MISKE refused to pay.

36.     On June 29, 2015, CI#2 reported that ███████████ was employed by MISKE.

████████ told CI#2 that he and MISKE's associate, Mike MALONE aka BUNTENBAH won a lot

of money sports betting during football season. On October 10, 2015 CI#2 reported that ████████

15

contacted CI#2 and asked if CI#2 could take an $8,000 bet on the Patriots/Cowboys game the following day. ▮▮▮▮▮ advised the bet was on behalf of the "Kama'aina guy"; CI#2 understood ▮▮▮▮▮ was referring to MISKE, the owner of KTPC.

37.     On October 8, 2015, CI#6 reported that MISKE and many of his associates were involved in gambling. MISKE would hold a meeting each morning at KTPC; during the meeting, MISKE and his employees would discuss sports bets. MISKE would complain about losing a $10,000 bet on a football game. SANTOS once used $10,000 cash he collected for a number of KTPC fumigation projects to place sports bets; SANTOS lost the bets and thus owed MISKE $10,000. ▮▮▮▮▮ eventually provided MISKE with $10,000 cash to cover SANTOS' loss. ▮▮▮▮▮ appeared to be the "house" through which MISKE, SANTOS and MISKE's other employees placed wagers. Cash pay-outs and collections were often conducted during KTPC meetings.

38.     On March 4, 2016, CW#10 reported they had an outstanding gambling debt of approximately $20,000 due in part to allowing MISKE access to their internet gambling account on the website www.spicyhot.com. MISKE ran up a debt of $6,000. On March 4, 2016, CW#10 voluntarily showed FBI Task Force Officers (TFOs) a text message conversation between CW#10 and MISKE that occurred on March 2, 2016. MISKE's phone number was (808) 594-8636. During the text message conversation, CW#10 pleaded with MISKE to pay the $6,000 debt so CW#10 could reconcile outstanding financial problems. MISKE explained that his son was in the hospital and he could not be bothered with CW#10 or the debt. In addition to the text messages, CW#10 identified MISKE's close associates as: John STANCIL, Michael BUNTENBAH, and ▮▮▮▮▮. CW#10 reported MISKE's phone number to be (808) 594-8636.

### Analysis of MISKE's Cellular Phones

39.     On September 29, 2015, CI#6 reported that MISKE always carried multiple phones,

and he was frequently changing numbers.  CI#6 used to manage the AT&T account for KTPC, and

MISKE often asked CI#6 to activate new phone numbers for MISKE.  MISKE also paid his

employees and associates to purchase and activate phones under their own names, which they

subsequently provided to MISKE for MISKE's personal use.  CI#6 recalled MISKE researching

encrypted phones and ordering a box of Blackberry phones from China.  Most of MISKE's phones

were Smartphones, but MISKE also carried a cheap, flip-style phone.  CI#6 once noticed that the

individuals who appeared to provide "muscle" for MISKE also had flip-style phones similar to

MISKE's.  By using multiple phones and frequently changing numbers, MISKE sought to minimize

the risk that law enforcement personnel would be able to listen to his phone calls.  CI#6 did not know

all of MISKE's phone numbers, but he knew MISKE utilized (808) 729-3034, (808) 341-4299 and

(808) 725-9658.

40.     Based on CI reporting and an extensive review of telephone records, it appeared that

MISKE routinely switched-out his use of cellular telephones.  MISKE's phones were never subscribed

to by MISKE himself; he only used phones that were subscribed to by other individuals, fictitious

names or KTPC.  Toll record analysis revealed that upon acquiring a new phone, MISKE initially

produced a high volume of telephonic activity.  However, after several months, telephonic activity

would begin to decrease, and MISKE would obtain a new phone number.  Based on investigation to

date, it was determined that MISKE used at least six phones between September 2014 and September

2015.  The six phone numbers were as follows:

**(808) 725-9658; T-Mobile**

According to T-Mobile, cellular telephone number (808)725-9658 was subscribed to by "John Naughton", with no address provided. Toll analysis revealed that during the period of September 2014 to April 2015, telephonic activity for (808) 725-9658 decreased over time, and in May 2015 activity ceased.

**(808) 341-4299; Verizon Wireless**

According to Verizon Wireless, cellular telephone number (808) 341-4299 was subscribed to by "Solana Grover", 1379 13th Avenue, Honolulu, Hawaii.  Toll analysis revealed that during the period of September 2014 to February 2015, telephonic activity for (808) 341-4299 increased from September to October 2014, then decreased as of December 2014.  According to telephone records, activity ceased as of late February 2015.

**(808) 729-3034; AT&T**

According to AT&T, cellular telephone number (808) 729-3034 was subscribed to by "John Naughton", 1067 Kapiolani Blvd, Honolulu, Hawaii.  Toll analysis revealed that during the period of October 2014 to July 2015, telephonic activity for (808) 729-3034 increased over time, with the highest volume observed in February 2015.  However, as of April 2015, telephonic activity significantly decreased. There were no outgoing calls from (808) 729-3034 as of late July 2015.

**(808) 439-5220; AT&T**

According to AT&T, cellular telephone number (808) 439-5220 was subscribed to by "Dayton Xelor", 765 Amana Street, Honolulu, Hawaii.  Telephone records revealed (808) 439-5220 was activated on February 27, 2015.  During the period April to June 2015, there was a significant

18

volume of telephonic activity, with the highest volume observed in June 2015; activity began to

decrease as of July 2015.

**(808) 859-9890; AT&T**

According to AT&T, cellular telephone (808) 859-9890 was subscribed to by Kama'aina

Termite and Pest Control, 940 Queen Street, Honolulu, Hawaii. Telephone records indicate (808)

859-9890 was activated on October 16, 2014. During the period of November 2014 to July 2015,

there was minimal telephonic activity on (808) 859-9890 compared to the four phones referenced

above.  Toll analysis revealed (808) 859-9890 was in contact with a few of MISKE's known

girlfriends, but it appeared MISKE did not use (808) 859-9890 to contact any of the individuals

identified by CIs as those who conducted "dirty work" for MISKE.  Of the five referenced

phones, (808) 859-9890 was the only phone registered to an entity directly connected to MISKE;

it was also the only phone MISKE did not use to contact his known criminal associates.

**(808) 594-8636; Verizon Wireless**

According to Verizon Wireless, cellular phone (808) 594-8636 was subscribed to by "Andy Ray"

and activated on September 29, 2015.  Records further revealed that "Andy Ray" provided

Verizon Wireless with residence address 201 Lime, Honolulu, Hawaii.  Toll analysis revealed

that telephonic activity for (808) 594-8636 increased over time and is currently active.

//

//

//

//

//

19

**Table 1: Telephonic Activity for the Five Cellular Telephones Used by MISKE That Were Registered to Alias Names**



September 2014 – February 2016

41.    Based on the above information, I believe there is probable cause that MISKE is utilizing multiple cellular phones to conduct criminal activity in violation of 18 U.S.C. § 1961 and 18 U.S.C. § 1962(d).  As shown above, MISKE drops phone numbers on a regular basis, and he does not register phone numbers under his own name.  Thus, it is likely that MISKE is currently utilizing phone numbers unknown to the FBI that are registered under alias identities. To successfully identify MISKE's Target Cellular Devices, your affiant believes the investigative device described hereafter is necessary to determine any and all of the phone numbers currently utilized by MISKE.

20

## **MANNER OF EXECUTION**

42.     In my training and experience, I have learned that cellular phones and other cellular

devices communicate wirelessly across a network of cellular infrastructure, including towers that

route and connect individual communications.  When sending or receiving a communication, a

cellular device broadcasts certain signals to the cellular tower that is routing its communication.

These signals include a cellular device's unique identifiers.

43.     To facilitate execution of this warrant, law enforcement may use an investigative device

that sends signals to nearby cellular devices, including the Target Cellular Device, and in reply, the

nearby cellular devices will broadcast signals that include their unique identifiers.  The investigative

device may function in some respects like a cellular tower, except that it will not be connected to the

cellular network and cannot be used by a cell to communicate with others.  Law enforcement will use

this investigative device when they have reason to believe MISKE is present.  Law enforcement will

collect the identifiers emitted by cellular devices in the immediate vicinity of the Target Cellular

Device when the subject is in multiple locations and/or multiple times at a common location and use

this information to identify the Target Cellular Device, as only the Target Cellular Device's unique

identifiers will be present in all or nearly all locations.  Once investigators ascertain the identity of the

Target Cellular Device, they will cease using the investigative technique.  Because there is probable

cause to determine the identity of the Target Cellular Device, there is probable cause to use the

investigative technique described by the warrant to determine the identity of the Target Cellular

Device.

44.     The investigative device may interrupt cellular service of cellular devices within its

immediate vicinity.  Any service disruption will be brief and temporary, and all operations will

attempt to limit the interference cellular devices.  Once law enforcement has identified the Target

Cellular Device, it will delete all information concerning non-targeted cellular devices.  Absent

further order of the court, law enforcement will make no investigative use of information concerning

non-targeted cellular devices other than distinguishing the Target Cellular Device from all other

devices.

### AUTHORIZATION REQUEST

45.     Based on the foregoing, I request that the Court issue the proposed search warrant,

pursuant to Federal Rule of Criminal Procedure 41.  The proposed warrant also will function as a pen

register order under 18 U.S.C. § 3123.

46.     I further request, pursuant to 18 U.S.C. § 3103a(b)(3) and Federal Rule of Criminal

Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until a

period of one year from the date of this order, within 14 days of the commencement of federal

charges arising out the use of this technique, or within 30 days of the closing of this investigation,

whichever event occurs first.  This delay is justified because there is reasonable cause to believe that

providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. §

2705.  Providing immediate notice to the person carrying the Target Cellular Device would seriously

jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to

destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18

U.S.C. § 3103a(b)(1).    There is reasonable necessity for the use of the technique described above,

for the reasons set forth above.  *See* 18 U.S.C. § 3103a(b)(2).

47.     I further request that the Court authorize execution of the warrant at any time of day or

night, owing to the potential need to identify the Target Cellular Device outside of daytime hours.

48.    I further request that the Court order that all papers in support of this application,

including the affidavit and search warrant, be sealed until further order of the Court.  These

documents discuss an ongoing criminal investigation that is neither public nor known to all of the

targets of the investigation.  Accordingly, there is good cause to seal these documents because their

premature disclosure may seriously jeopardize that investigation.

49.    A search warrant may not be legally necessary to compel the investigative technique

described herein.  Nevertheless, I hereby submit this warrant application out of an abundance of

caution.

Respectfully submitted,

AUSTIN KYLE JACKSON
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on June __7__, 2016.

KENNETH J. MANSFIELD
United States Magistrate Judge

23